# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Case No. 7:24-cv-07042

Related Case No. 7:21-cv-07532

|  |  |
|---|---|
| In re:<br><br>PURDUE PHARMA L.P., *et al.*,<br><br>        Debtors. | Chapter 11<br><br>Case No. 19-23649 (SHL) |
| State of Maryland<br><br>        Appellant,<br>    v.<br><br>PURDUE PHARMA L.P., *et al.*,<br><br>        Appellees. | Adv. Pro. No. 19-08289 (SHL)<br><br>On Appeal from the United States Bankruptcy Court for the Southern District of New York |

## BRIEF OF THE DEBTOR-APPELLEES

Marshall S. Huebner
(*marshall.huebner@davispolk.com*)
Benjamin S. Kaminetzky
(*ben.kaminetzky@davispolk.com*)
James I. McClammy
(*james.mcclammy@davispolk.com*)
Marc J. Tobak
(*marc.tobak@davispolk.com*)
Joshua N. Shinbrot
(*Joshua.shinbrot@davispolk.com*)

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800

*Counsel to the Debtors-Appellees
and Debtors in Possession*

## CORPORATE DISCLOSURE STATEMENT

Purdue Pharma L.P. ("**PPLP**") and its debtor and debtor in possession affiliates in the above-captioned chapter 11 proceedings (collectively, the "**Debtors**")[1], by and through undersigned counsel, respectfully represent:

1.    Nondebtor Pharmaceutical Research Associates L.P. directly owns 100% of the ownership interests of Purdue Pharma L.P.  Nondebtor PLP Associates Holdings L.P. directly owns approximately 99.5061% of the ownership interests of Pharmaceutical Research Associates L.P.  Nondebtor BR Holdings Associates L.P. directly owns 100% of the ownership interests of PLP Associates Holdings L.P.  Nondebtor Beacon Company and nondebtor Rosebay Medical Company L.P. each directly owns 50% of the ownership interests of BR Holdings Associates L.P.  Nondebtor Heatheridge Trust Company Limited, as Trustee under Settlement dated December 31, 1993, directly owns 100% of the ownership interests of Beacon Company. Nondebtors Richard S. Sackler, M.D. and Cedar Cliff Fiduciary Management Inc., as Trustees under Trust Agreement dated November 5, 1974, directly own 98% of the ownership interests of Rosebay Medical Company L.P.  To the best of the Debtors' knowledge and belief, none of these

---

[1] The Debtors, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Purdue Products L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

entities is publicly held, and no other person or entity directly or indirectly owns 10% or more of the ownership interests of PPLP.

2.      Nondebtor Banela Corporation directly owns 50% of the ownership interests of debtor Purdue Pharma Inc. ("PPI"); nondebtor Linarite Holdings LLC directly owns 25% of the ownership interests of PPI; and nondebtor Perthlite Holdings LLC directly owns 25% of the ownership interests of PPI.  Nondebtor Millborne Trust Company Limited, as Trustee of the Hercules Trust under Declaration of Trust dated March 2, 1999, directly owns 100% of the ownership interests of Banela Corporation.  Nondebtor Data LLC, as Trustee under Trust Agreement dated December 23, 1989, directly owns 100% of the ownership interests of Linarite Holdings LLC.  Nondebtor Cornice Fiduciary Management LLC, as Trustee under Trust Agreement dated December 23, 1989, directly owns 100% of the ownership interests of Perthlite Holdings LLC.  To the best of the Debtors' knowledge and belief, none of these entities is publicly held, and no other person or entity directly or indirectly owns 10% or more of the ownership interests of PPI.

3.      Each of the remaining debtors is wholly owned, directly or indirectly, by PPLP and PPI, as follows:

4.      PPLP directly owns 100% of the ownership interests of debtors Purdue Transdermal Technologies L.P., Purdue Pharma Manufacturing L.P., Purdue Pharmaceuticals L.P., Imbrium Therapeutics L.P., Adlon Therapeutics L.P., Greenfield BioVentures L.P., Seven Seas Hill Corp., Ophir Green Corp., Purdue Products L.P. (f/k/a Avrio Health L.P.), Purdue Pharmaceutical Products L.P., Nayatt Cove Lifescience Inc., and Rhodes Associates L.P.

5.      PPLP directly owns 99% of the ownership interests of debtor Purdue Neuroscience Company.  PPI directly owns the remaining 1% of the ownership interests of Purdue Neuroscience Company.

6.      Seven Seas Hill Corp. and Ophir Green Corp. each directly owns 50% of the ownership interests of debtor Purdue Pharma of Puerto Rico.

7.      Rhodes Associates L.P. directly owns 100% of the ownership interests of debtors Paul Land Inc., Rhodes Pharmaceuticals L.P., and Rhodes Technologies.

8.      Rhodes Technologies directly owns 100% of the ownership interests of debtors UDF LP and SVC Pharma Inc.

9.      UDF LP directly owns 100% of the ownership interests of debtors Button Land L.P. and Quidnick Land L.P.

10.     UDF LP directly owns 99% of the ownership interests of debtor SVC Pharma LP. SVC Pharma Inc. directly owns the remaining 1% of the ownership interests of SVC Pharma LP.

# TABLE OF CONTENTS

<u>PAGE</u>

CORPORATE DISCLOSURE STATEMENT ............................................................... ii

JURISDICTIONAL STATEMENT ............................................................................ 1

COUNTERSTATEMENT OF ISSUES ON APPEAL............................................... 1

PRELIMINARY STATEMENT ................................................................................ 2

BACKGROUND ....................................................................................................... 8

I.      THE RELEVANT PARTIES ............................................................... 8

II.     EVENTS LEADING TO THE DEBTORS' CHAPTER 11 FILING ..................... 8

III.    THE PRELIMINARY INJUNCTION.................................................. 10

    A.    This Court Affirms the Preliminary Injunction on Appeal ...................... 11

    B.    The Bankruptcy Court Extends the Preliminary Injunction and Orders
          Expedited Mediation After the Supreme Court's Decision ..................... 13

        i.     *The Thirty-Sixth Amended Order* ................................................. *13*

        ii.    *The Thirty-Seventh Amended Order* ............................................ *15*

        iii.   *The Thirty-Eighth Amended Order* ............................................... *18*

        iv.    *The Thirty-Ninth Amended Order* ................................................ *20*

STANDARD OF REVIEW ON APPEAL ............................................................... 23

ARGUMENT ........................................................................................................... 24

I.      THE BANKRUPTCY COURT HAD SUBJECT MATTER
        JURISDICTION TO TEMPORARILY ENJOIN MARYLAND'S
        CLAIMS ............................................................................................. 24

II.     THE PRELIMINARY INJUNCTION IS COMFORTABLY WITHIN
        THIS COURT'S STATUTORY AUTHORITY ................................... 28

    A.    Section 105(a) Empowers Bankruptcy Courts to Enjoin Third-Party
          Litigation That Impedes A Pending Reorganization. ............................... 28

    B.    The Preliminary Injunction Is Consistent With Traditional Principles
          Of Equity Jurisprudence ......................................................................... 32

III.    THE PRELIMINARY INJUNCTION FACTORS SUPPORT THE
        EXTENSIONS OF THE PRELIMINARY INJUNCTION................... 34

A.    The Debtors' Prospects for a Successful Reorganization Are Reasonable ..................................................................................... 34

B.    Irreparable Harm Would Befall the Estates if the Injunction is Lifted ...... 36

C.    The Balance of Harms and Public Interest Support Extension of the Injunction ....................................................................................... 40

CONCLUSION ..................................................................................................... 41

# TABLE OF AUTHORITIES

### Case(s)

PAGE(S)

*Adler v. Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings Inc.),*
    855 F.3d 459 (2d Cir. 2017) ................................................................................. 23

*In re Ajasa,*
    627 B.R. 6 (Bankr. E.D.N.Y. 2021) ...................................................................... 31

*Anderson v. City of Bessemer,*
    470 U.S. 564 (1985) ............................................................................................. 24

*Arizona v. California,*
    460 U.S. 605 (1983) ............................................................................................. 26

*In re Baldwin-United Corp. Litig.,*
    765 F.2d 343 (2d Cir. 1985) ................................................................................. 28

*Barnes v. Tarrytown Urb. Renewal Agency,*
    338 F. Supp. 257 (S.D.N.Y. 1971) ...................................................................... 33

*In re Bernard L. Madoff Inv. Secs., LLC,*
    512 F. App'x 18 (2d Cir. 2013) ........................................................................... 28

*Browning v. Navarro,*
    743 F.2d 1069 (5th Cir. 1984) ............................................................................. 29

*In re Bush Terminal Co.,*
    78 F.2d 662 (2d Cir. 1935) ................................................................................... 29

*In re Caesars Ent. Operating Co., Inc.,*
    808 F.3d 1186 (7th Cir. 2015) ............................................................................. 28

*In re Canter,*
    299 F.3d 1150 (9th Cir. 2002) ........................................................................ 28-29

*Carlton v. Firstcorp, Inc.,*
    967 F.2d 942 (4th Cir. 1992) ............................................................................... 29

*Celotex Corp. v. Edwards,*
    514 U.S. 300 (1995) ............................................................................................. 24

*In re Chanticleer Assocs., Ltd.,*
    592 F.2d 70 (2d Cir. 1979) ................................................................................... 29

*Chao v. Hosp. Staffing Servs., Inc.,*
    270 F.3d 374 (6th Cir. 2001) ............................................................................... 29

*In re Coast to Coast Leasing, LLC*,
    661 B.R. 621 (Bankr. N.D. Ill. 2024) ................................................................ 32

*Continental Illinois Nat. Bank & Trust Co. v. Chicago, Rock Island & Pac. Ry. Co.*,
    294 U.S. 648 (1935) ........................................................................................... 29

*De Beers Consol. Mines v. United States*,
    325 U.S. 212 (1945) ...........................................................................................33

*In re Diocese of Buffalo, N.Y.*,
    663 B.R. 197 (Bankr. W.D.N.Y. 2024) ............................................................. 32

*Elliot v. Gen. Motors LLC (In re Motors Liquidation Co.)*,
    829 F.3d 135 (2d Cir. 2016) ............................................................................. 24

*In re Fundamental Long Term Care, Inc.*,
    527 B.R. 497 (Bankr. M.D. Fla. 2015) .............................................................. 30

*In re G-I Holdings, Inc.*,
    327 B.R. 730 (Bankr. D.N.J. 2005) ................................................................... 31

*In re Golden*,
    630 B.R. 896 (Bankr. E.D.N.Y. 2021) .............................................................. 31

*In re Haynes*,
    2014 WL 3608891 (Bankr. S.D.N.Y. July 22, 2014) ......................................... 33

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
    527 U.S. 308 (1999) ........................................................................................... 33

*Harrington v. Purdue Pharma L.P.*,
    144 S. Ct. 2071 (2024) ........................................................................... 4, 13, 26

*In re Ionosphere Clubs, Inc.*,
    111 B.R. 423 (Bankr. S.D.N.Y. 1990), *aff'd in part*, 124 B.R. 635 (S.D.N.Y. 1991) ........... 39

*In re Joint E. & S. Dists. Asbestos Litig.*,
    120 B.R. 648 (E.D.N.Y. 1990) .......................................................................... 30

*Koch v. Christie's Int'l PLC*,
    699 F.3d 141 (2d Cir. 2012) ............................................................................. 27

*Kosha, LLC v. Alford*,
    2019 WL 6050725 (M.D. Ga. Nov. 7, 2019) ...................................................... 33

*MacArthur Co. v. Johns-Manville Corp.*,
    837 F.2d 89 (2d Cir. 1988) ................................................................................28

*In re Mastro*,
    585 B.R. 587 (B.A.P. 9th Cir. 2018) ................................................................. 31

*In re Onyx Site Servs., LLC*,
    2024 WL 4132150 (Bankr. M.D. Fla. Aug. 22, 2024) .......................................... 32

*In re Parlement Techs., Inc.*,
    661 B.R. 722 (Bankr. D. Del. 2024) .................................................................32

*Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp.*,
    639 F.3d 572 (2d Cir. 2011) ........................................................................... 25

*In re PCH Assocs.*,
    949 F.2d 585 (2d Cir. 1991) ........................................................................... 26

*Penn Terra Ltd. v. Dep't of Env't Res., Com. of Pa.*,
    733 F.2d 267 (3d Cir. 1984) ...........................................................................29

*Picard v. Fairfield Greenwich Ltd.*,
    762 F.3d 199 (2d Cir. 2014) ...........................................................................23

*In re Purdue Pharms. L.P.*,
    69 F.4th 45 (2d Cir. 2023) .................................................................24, 26, 27

*In re Purdue Pharms. L.P.*,
    633 B.R. 53 (Bankr. S.D.N.Y. 2021) ............................................................. 35

*In re Purdue Pharms. L.P.*,
    619 B.R. 38 (S.D.N.Y. 2020) ........................................................... *passim*

*In re Quigley Corp. Inc.*,
    676 F.3d 45 (2d Cir. 2012) ............................................................................. 14

*Republic of Philippines v. Marcos*,
    806 F.2d 344 (2d Cir. 1986) ........................................................................... 34

*Shalala v. Ill. Council on Long Term Care, Inc.*,
    529 U.S. 1 (2000) .......................................................................................... 27

*In re Soundview Elite Ltd.*,
    543 B.R. 78 (Bankr. S.D.N.Y 2016) .............................................................. 35

*SPV Osus Ltd. v. UBS AG*,
    882 F.3d 333 (2d Cir. 2018) ...........................................................11, 14, 25, 26

*State of Mo. v. U.S. Bankr. Ct. for E. D. of Ark.*,
    647 F.2d 768 (8th Cir. 1981) ..........................................................................29

*In re SVB Fin. Grp.*,
    2023 WL 2962212 (Bankr. S.D.N.Y. Apr. 14, 2023) ......................................36

*In re The 1031 Tax Grp., LLC*,
    397 B.R. 670 (Bankr. S.D.N.Y. 2008) ............................................................39

*Weston v. Bayne*,
  2023 WL 8183219 (N.D.N.Y. Nov. 27, 2023) ........................................................ 33

*Williams v. N.Y.C. Dep't of Corr.*,
  2020 WL 7079497 (S.D.N.Y. Dec. 3, 2020) ......................................................... 33

*World Sleep Prods., Inc. v. Restonic Corp.*,
  1995 WL 792078 (N.D.N.Y. Aug. 25, 1995) ........................................................ 34

*In re WorldCom, Inc. Sec. Litig.*,
  293 B.R. 308 (S.D.N.Y. 2003) .......................................................................... 25

*WPIX, Inc. v. ivi, Inc.*,
  691 F.3d 275 (2d Cir. 2012) ............................................................................ 23

### Statutes & Rules

11 U.S.C. § 105(a) .................................................................................... *passim*
11 U.S.C. §§ 362(b)(4) ................................................................................... 10
11 U.S.C. § 1123(b)(6) .................................................................................13, 26
11 U.S.C. § 1651(a) ......................................................................................29
28 U.S.C. § 158(a)(1) .....................................................................................1
28 U.S.C. § 1334 .........................................................................................11
28 U.S.C. § 1334(b) ...................................................................................14, 24
28 U.S.C. § 2283 .........................................................................................30
28 U.S.C. § 157(b) .........................................................................................1

### Other Authorities

Am. Statement of Charges, *Consumer Prot. Div. v. Sackler*, CPD Case No. 19-023-311366 (Md.
Consumer Protective Div. May 29, 2019) ..........................................................37

Bankr. Act of 1898, 55 Stat. 546 (1898) ............................................................30

Bankr. Act § 2(15) ....................................................................................29-30

Judiciary Act of 1789 Section 14, 1 Stat. 81-82 ....................................................30

S. Rep. No. 989, 95th Cong., 2d Sess. 51 (1978), *reprinted in* App. Pt. 4(e)(i) ..........................30

H. R. Rep. No. 595, 95th Cong., 1st Sess. 341-42 (1977), *reprinted in* App. Pt. 4(d)(i) .......30, 31

## JURISDICTIONAL STATEMENT[2]

The Bankruptcy Court correctly determined that, pursuant to 28 U.S.C. §§ 157(b) and 1334(b), it had subject matter jurisdiction to temporarily enjoin Appellant's pursuit of claims against the Debtors and their Related Parties.[3]

This Court has appellate jurisdiction under 28 U.S.C. § 158(a)(1) with respect to the Thirty-Seventh Amended Order, dated September 6, 2024 (the "**Thirty-Seventh Extension**") (A0817), the Thirty-Eighth Amended Order, dated September 27, 2024 (the "**Thirty-Eighth Extension**") (A1199), and the Thirty-Ninth Amended Order, dated November 1, 2024 (the "**Thirty-Ninth Extension**") (SA4458).

## COUNTERSTATEMENT OF ISSUES ON APPEAL

1.    Did the Bankruptcy Court properly conclude that it had subject matter jurisdiction under 28 U.S.C. §§ 157(b) and 1334(b) to temporarily enjoin Appellants from pursuing claims against the Debtors' Related Parties?

2.    Did the Bankruptcy Court properly conclude that it had statutory authority to temporarily enjoin Appellants from pursuing claims against the Debtors' Related Parties?

3.    Did the Bankruptcy Court abuse its discretion in temporarily enjoining Appellants from pursuing claims against the Debtors' Related Parties?

---

[2] Citations prefaced with the letter "A" refer to Appellants' Appendix [Case No. 124-cv-7042, ECF No. 16]. Citations prefaced with the letters "SA" refer to the Appellee's Supplemental Appendix, filed herewith. Unless otherwise noted, ECF numbers refer to docket entries in this Appeal.

[3] As defined below.

## PRELIMINARY STATEMENT

The Bankruptcy Court's almost universally-supported extension of the preliminary injunction ("**P.I.**") to facilitate mediation and progress towards a broadly supported reorganization plan should be affirmed.  The P.I. is a straightforward exercise of statutory authority to enjoin litigation that would impede a reorganization, long-established in Supreme Court and Second Circuit jurisprudence, and rooted in the equitable powers of federal courts first codified in the Judiciary Act of 1789.  The Court's decision to extend the injunction in several limited extensions of 35 or fewer days is a sound exercise of discretion, based on an evidentiary record built over more than five years, and bolstered by the recent in-court presentation by one of the Mediators explaining that the P.I. was and remains essential to preserving and continuing the material progress achieved to date towards a successful reorganization.

On October 11, 2019, the Bankruptcy Court entered the initial P.I.  Later, the Bankruptcy Court, in stages, extended the P.I. through plan confirmation in August 2021.  For nearly three years, from 2021 through late June 2024, the P.I. remained in place for the duration of the appellate process.  On June 27, 2024, affirming this Court, the Supreme Court held that nonconsensual third-party releases are unauthorized by the Bankruptcy Code.  Days later, the Debtors and all of their key creditor constituencies swiftly and consensually returned to mediation—as they have at other critical junctures in these cases—to explore whether they could achieve a value-maximizing plan of reorganization in the new legal landscape.

To facilitate this mediation, the Debtors have sought four short extensions of the P.I.  Each of the requests to extend the mediation, and with it the P.I., was made at the direction of the Mediators (The Honorable Shelley Chapman (Ret.) and Professor Eric Green).  In its most recent order, the Court credited a presentation by Judge Chapman.  Judge Chapman described material progress; represented that the Mediators view the remaining open issues as resolvable; and in an

extended colloquy with Judge Lane, explained that the P.I. is essential to preserving and continuing the progress achieved towards a successful reorganization.

Nearly all key stakeholders, including the overwhelming majority of Appellant's sister states, support or do not object to the short, requested extensions of the P.I.  Due to substantial incremental progress in the mediation, the supporters of the most recent extension of the P.I. include the Mediators, the State AG Negotiating Committee, the Official Committee of Unsecured Creditors (the "**UCC**"), the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "**AHC**")—which consists of (i) ten states; (ii) the court-appointed Plaintiffs' Executive Committee in the MDL captioned *In re National Prescription Opiate Litigation*, Case No. 17-md-02804 (N.D. Ohio) (the "**MDL**"); (iii) six counties, cities, parishes, or municipalities; and (iv) one federally recognized American Indian Tribe—and the Multi-state Governmental Entities Group (the "**MSGE**"), which represents over 1,200 municipalities across the United States.  Relying upon that support, the history of successful mediation in these cases, an extensive evidentiary record of the harms that befell the Debtors prior to entry of the P.I., and the oral interim report of the Mediators, on November 1, 2024 the Bankruptcy Court extended the P.I. for 31 days through December 2, 2024.

Tellingly, only Maryland has timely appealed the extensions.[4]  Maryland proffers four flawed arguments:

---

[4] As of the filing deadline, Appellant has filed notices of appeal of the 37th Amended Order Extending the Preliminary Injunction (which expired on September 27, 2024) (A1119), and the 38th Amended Order Extending the Preliminary Injunction (which expired on November 1, 2024) (A1501).  Although Appellant has not yet filed a notice of Appeal of the 39th Amended Order Extending the Preliminary Injunction, which was entered on November 1, 2024 and expires on December 2, 2024 (SA3605), the Debtors assume that Maryland will file a timely notice of appeal to ensure a live controversy is presented at the hearing on this Appeal.

First, Maryland asserts an absence of subject matter jurisdiction.  As this Court expressly held in *In re Purdue Pharms. L.P.*, 619 B.R. 38, 48 (S.D.N.Y. 2020) (hereinafter "*Dunaway*"), the Bankruptcy Court has related-to jurisdiction over the Related Party claims, and as such had subject matter jurisdiction to temporarily enjoin them.

Second, misreading *Harrington v. Purdue Pharma, L.P.*, 144 S. Ct. 2071 (2024), Appellant asserts that the Supreme Court vitiated any statutory authority to issue the P.I.  Contrary to Appellant's assertion, *Harrington* was explicitly cabined to the question of whether the Bankruptcy Code authorizes a permanent nonconsensual third-party release as part of a plan of reorganization that has the effect of a discharge.  Nothing in *Harrington* overturned nearly 90 years of Supreme Court and Second Circuit precedent recognizing the centuries-old authority of courts to temporarily enjoin third-party litigation that interferes with a court's jurisdiction.  That broad power, originally rooted in the All Writs Act and later the Bankruptcy Act, was subsequently expanded when Congress enacted Section 105(a) of the Bankruptcy Code, and authorizes the *temporary* injunction here.

Third, Appellant asserts that the Bankruptcy Court abused its discretion in determining that the Debtors' reorganization remains reasonably likely to succeed.  Untethered from the record of these cases, Maryland contends that there have been "five years of non-success" and "the preliminary injunction is the problem, not the solution."  To the contrary, the P.I. has fostered remarkable success in these cases.  With the P.I. in place, the Debtors and the overwhelming majority of their creditors managed to negotiate a broadly consensual plan of reorganization reflecting dozens of interlocking, intercreditor settlements that would have provided billions of dollars in value to creditors.  Mediation, protected by the P.I., also facilitated an enhanced settlement while the Debtors' appeal was pending before the Second Circuit, where

all remaining objecting states, including Maryland, agreed to drop their objections to the plan in exchange for additional consideration from the Sackler Family. And material new progress is being made daily.

Against that backdrop, Maryland's assertion that it has been involuntarily barred from pursuing its claims against members of the Sackler Family for five years is misleading, if not flatly false. For 95.4% of the period that the injunction has been in place, Maryland has voluntarily complied with the P.I. While Maryland was part of an initial group of objectors to the issuance of the P.I. on October 11, 2019, it did not object to or appeal any extension of the P.I. from the time of the second extension on November 6, 2019 through September 9, 2024. And from March 10, 2022 through the Supreme Court's decision on June 27, 2024 (2.3 years), Maryland was a party to an enhanced settlement with the Sacklers, which included a temporary injunction of its claims against the Sacklers and a consensual permanent release of those claims if the Plan had been upheld. As the Bankruptcy Court found, given the extraordinary complexity of these cases, the parties' request for additional time to work towards a deal with the protection of the P.I. is not unreasonable.

With the continued protection of the P.I., the parties have made substantial progress towards a new, value-maximizing resolution of these cases, and the Mediators have explained that they believe the remaining open issues are resolvable. Indeed, near-universal support for or non-objection to the extension of the PI, including from many of Maryland's sister states, itself suggests that a successful reorganization remains reasonably likely. The Bankruptcy Court did not abuse its discretion in finding that the Debtors' still have prospects of a successful reorganization, and extension of the P.I. increases the likelihood of that success.

Fourth, Appellant asserts that the Bankruptcy Court abused its discretion in finding that the Debtors would suffer irreparable harm absent the injunction because the only harm the Debtors would face is "speculative." That argument ignores the extensive factual findings of actual harm to the Debtors before the Bankruptcy Court entered the P.I. Repeated factual findings through the five-year history of these cases establish that (i) the Estates' most valuable assets are its claims against the Sacklers; (ii) there is substantial overlap between the direct claims and the Estate claims against the Sacklers; and (iii) because of the overlapping nature of the direct and Estate claims, litigation of the direct claims would prejudice Estate assets. Maryland does not actually contest these findings. Nor could it. An early loss by whichever litigants win the race to the courthouse would reduce the value of the Estates' claims and obstruct efforts to reach a value-maximizing plan. Conversely, a win by a competing litigant would jeopardize the Sacklers' ability to satisfy judgments or pay settlements with respect to the Estates' claims. Contrary to Maryland's specious assertion that the P.I. is there to protect the Sacklers, its purpose is to protect the Estates' most valuable asset and the Court's jurisdiction over the Debtors' property.

The Bankruptcy Court also correctly concluded that the Debtors would suffer substantial monetary and nonmonetary burdens from present litigation of the Related Party claims. Because the claims against the Related Parties are essentially puppeteering claims, the Debtors' documents and current and former employees would be at the center of discovery in all such litigations, of which there could be hundreds. And recent evidence presented to the Bankruptcy Court demonstrates that the Debtors, which have suffered from substantial attrition, would be forced to respond to such requests with a dwindling number of employees, distracting them from the critical tasks of running the Debtors' businesses and mediating a resolution to these cases.

Moreover, Appellant fails to acknowledge that the support or non-objection of nearly all of the Debtors' key stakeholders provided the Bankruptcy Court with a reasonable basis to infer that the Debtors remain more likely to reorganize with the injunction in place than without it.

Fifth, according to the Appellant, the Bankruptcy Court also abused its discretion in finding that the balance of harms favors a further extension of the P.I. Maryland asserts that its inability to pursue "civil, administrative, and regulatory law enforcement" against the Sacklers "vastly exceeds Purdue's minimal-by-comparison private interest in obtaining a 'fresh start'." In reality, however, the Voluntary Injunction (which is also extended under the P.I.) already bars the Sacklers from engaging in the opioid business in the United States. To the extent Maryland wishes to pursue any criminal claims against any party, that is not and has never been barred by the P.I.

Put simply, the only possible harm Maryland suffers with the P.I. in place is its inability to jump the line and pursue money damages against the Sacklers now. In that respect, Maryland is similarly situated to hundreds of thousands of the Debtors' other creditors—and nearly all other states—none of which have timely appealed the P.I. The Bankruptcy Court did not abuse its discretion in determining that the balance of harms and the public interest weigh in favor of an extension of the P.I. to allow the parties to attempt to mediate a new plan structure that will provide a value-maximizing and broadly consensual resolution of these cases.

Because the P.I. is within the Bankruptcy Court's subject matter jurisdiction, authorized by Section 105(a) of the Bankruptcy Code, and supported by an extensive evidentiary record, this Court should affirm.

## BACKGROUND[5]

### I.    THE RELEVANT PARTIES

The Debtors are pharmaceutical companies that manufacture FDA-approved medications, including OxyContin.  Purdue Pharma L.P. ("**Purdue**") is the Debtors' main operating entity.  SA891.  Purdue is indirectly wholly-owned by trusts established for the benefit of the descendants of Mortimer and Raymond Sackler.  SA4770.  Over the years, various members of the Sackler families served as directors, officers, and employees of Purdue.  SA4777.  No Sackler has served as an employee or officer since May 2007, or as a director since January 2019, almost six years ago.  *Id.*

In May, 2019, Maryland commenced an administrative proceeding against Purdue and certain Related Parties, including seven Sackler family members based on allegedly unfair and deceptive trade practices (hereinafter, "**Maryland Action**").  *See* SA7052.  With respect to the Sackler defendants, Maryland seeks money damages in the form of restitution, disgorgement, economic damages, costs of the proceeding and investigation, civil penalties, and an order requiring the Sackler defendants to cease and desist from engaging in unfair or deceptive trade practices in violation of the Consumer Protection Act.  SA7156.

### II.    EVENTS LEADING TO THE DEBTORS' CHAPTER 11 FILING

Prior to the Debtors' bankruptcy filing, the Debtors faced over 2,600 civil actions in scores of judicial fora (the "**Pending Actions**").  *See* SA891.  Substantially all of the Pending

---

[5] The Debtors are mindful of the Court's familiarity with these proceedings, and appreciate the Court's suggestion that the parties' briefing below is sufficient on this Appeal. [ECF No. 17].  However, because (a) this Appeal arises from three separate orders, each of which was individually briefed and argued before the Bankruptcy Court, and (b) Appellant raises issues that were never presented to the Bankruptcy Court, the Debtors have provided a single comprehensive brief for the convenience of the Court.

Actions asserted similar claims based on the Debtors' allegedly false and deceptive marketing of OxyContin.  SA1334.

Many of those actions also named as defendants certain of the Debtors' beneficial owners (members of the Sackler families) and current and former executives (collectively the "**Related Parties**" or "**Related Party**").  SA88.  In 2019, the naming of certain Related Parties—specifically, Sackler Family members—emerged and accelerated.  *Id.*  Indeed, in just the one week before the Debtors filed for bankruptcy, the attorneys general of seven states filed, or announced their intention to file, complaints naming only the Sacklers as Defendants.  Although these actions nominally omitted Purdue and other Debtors, the claims and allegations in the complaints concern the Debtors' manufacture and sale of opioid products and essentially replicate the claims against the Debtors in the Pending Actions.  SA1334.  At the time of the Debtors' Chapter 11 petition, there were hundreds of pending cases against the Related Parties. SA88.

The Maryland Action is representative of the hundreds of suits that named both Purdue and the Related Parties as defendants.  It contains dozens of substantive allegations against Richard S. Sackler, Jonathan D. Sackler, Mortimer D.A. Sackler, Kathe A. Sackler, Ilene Sackler Lefcourt, Theresa Sackler, and David A Sackler—former directors and officers of the Debtors— related to their alleged direction of and participation in Purdue's misconduct.  SA7068-7077. For instance, Maryland alleges that:

- "The Sackler Respondents were chief architects and beneficiaries of Purdue's false marketing and deception and failure to report suspicious orders."  SA7078.

- "The Sackler Respondents controlled and directed all of the misconduct described [in the Maryland Action]."  SA7079.

As with the hundreds of other Pending Actions against the Sacklers, Maryland did not allege that the Sacklers violated any laws other than in connection with their relationship with the Debtors.

Not only was Purdue named as a defendant in thousands of suits, but it also faced indemnification and contribution claims in actions against the Related Parties that nominally omitted the Debtors. *See* SA1759.

By September 2019, the onslaught of actions proved unmanageable for the Debtors. Litigation of thousands of actions to judgment and through appeals would result in the financial and operational destruction of the Debtors and the squandering of hundreds of millions or billions of dollars on professional fees. Faced with that reality, on September 15, 2019, the Debtors filed for chapter 11 protection.

## III.   THE PRELIMINARY INJUNCTION

The Debtors' chapter 11 petition triggered an automatic stay of many of the Pending Actions against the Debtors. However, the automatic stay did not cover two extremely burdensome categories of litigation: (i) actions subject to the so-called police power exception to the automatic stay, *see* 11 U.S.C. § 362(b)(4),[6] and (ii) actions against the Related Parties. The Debtors accordingly sought to temporarily enjoin the litigation pending against both the Debtors and the Related Parties pursuant to 11 U.S.C. § 105(a). In support, the Debtors (backed by the UCC and AHC) submitted thousands of pages of evidence detailing the extraordinary burdens of ongoing litigation.

On October 11, 2019, the Bankruptcy Court held a full-day hearing at which the Debtors introduced extensive evidence demonstrating the irreparable harm the bankruptcy estates would suffer absent an injunction, including that:

---

[6] The Debtors do not concede that any of the Pending Actions are within the automatic stay's police power exception. To avoid a time and resource depleting claim-by-claim adjudication of the applicability of the exception, the Debtors sought to temporarily enjoin such actions pursuant to Section 105(a).

- The Debtors were projected to spend hundreds of millions of dollars on legal fees and expenses in 2019, directly related to the thousands of opioid-related lawsuits (A0065, SA891);

- Financial costs aside, the time and energy required to monitor, manage, and direct the Debtors' response to the litigation was also enormous, and detracted from the business (A0065, SA879-880); and

- Because the claims against Related Parties are inextricably intertwined with those against the Debtors and arise from allegations concerning their conduct while affiliated with the Debtors, the Debtors had been—and would continue to be—a target of discovery on such claims because they possess the bulk of the potentially relevant documents and evidence. (SA1346-1348, A0065).

At the conclusion of the hearing, during which the Court also heard extensive oral argument, it entered an order conditionally granting the P.I. through November 6, 2019. A0334. Following another hearing on November 6, 2019, the Court entered a final order (the "November 2019 Order") granting the P.I. through April 8, 2020. A0346. Since then, the bankruptcy court has issued 37 additional orders further extending the duration of the P.I. and enforcing it against newly-filed actions.

### A.    This Court Affirms the Preliminary Injunction on Appeal

Shortly after the Bankruptcy Court's November 2019 Order, five district attorneys from Tennessee and an infant born dependent on opioids appealed the November 2019 order. *See Dunaway*, 619 B.R. 38, 42 (S.D.N.Y. 2020). The *Dunaway* appellants advanced substantially similar arguments to Maryland's arguments here, including that (1) the bankruptcy court lacked jurisdiction to enjoin an action brought by governmental actors against a non-debtor third party; and (2) the Bankruptcy Court erred in granting the P.I. based on the record before it. On August 11, 2020, this Court rejected both arguments and affirmed the Court's P.I. Order. *Id.*

This Court held that bankruptcy courts have "related to" jurisdiction under 28 U.S.C. § 1334 "over every case where 'the action's outcome might have <u>any conceivable</u>

effect on the bankrupt estate." *Id.* at 48-49 (quoting *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333,

339-40 (2d Cir. 2018)) (emphasis added). The Court identified two independent reasons why

that standard encompassed Tennessee's claims against Dr. Sackler. *Id.* *First*, they were "highly

interconnected" with the claims against the Debtors which, the Court observed, has frequently

served as the basis for "related to" jurisdiction in the Second Circuit. *Id.* at 49 (citation and

internal quotations omitted). Indeed, the allegations against Dr. Sackler relied "on the same facts

to establish the liability of both" Dr. Sackler and the Debtors. *Id.* at 50-51 ("[T]here is no way

for the Appellants to pursue the allegations against Dr. Sackler without implicating Purdue, and

vice versa."). *Second*, this Court held that the Bankruptcy Court had "related to" jurisdiction

over the *Dunaway* Action because it was "at the very least conceivable that a proceeding against

Dr. Sackler could result in his asserting a claim for contribution or indemnification against

Purdue—which is to say, against the Debtors' estate." *Id.* at 51.

       This Court then turned to the question of whether the P.I. was appropriately granted

under 11 U.S.C. § 105(a)—a question again raised by Maryland. The Court rejected the

contention that bankruptcy courts cannot enjoin third-party actions under Section 105(a), and

held that it "is properly used to enjoin creditors' lawsuits against third parties where the

injunction plays an important part in the debtor's reorganization plan or where the action to be

enjoined will have an immediate adverse economic consequence for the debtor's estate." *Id.* at

57 (citations and internal quotation marks omitted). The Court then held that pursuant to that

authority, the Bankruptcy Court properly found that each of the four relevant factors used to

evaluate injunctions under Section 105(a) was met. *Id.* at 57-62.

**B.      The Bankruptcy Court Extends the Preliminary Injunction and Orders Expedited Mediation After the Supreme Court's Decision**

On June 27, 2024, the Supreme Court held that section 1123(b)(6) of the Bankruptcy Code does not authorize nonconsensual permanent releases of claims of a nondebtor against another nondebtor. *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071, 2088 (2024). The Supreme Court's decision was expressly "confin[ed] to the question presented" and did not address or alter a bankruptcy court's authority to issue a preliminary injunction of third-party claims under Section 105(a). *Id.*

The Debtors soon thereafter moved for an extension of the P.I. alongside entry of an order authorizing mediation, in order to "preserve, to the greatest extent possible, the dozens of interlocking settlements that took years to negotiate and formed the foundation of the Plan." A0385. The motion had the overwhelming support of all major creditor constituencies, and was opposed only by a single *pro se* claimant. *See* A0420 (all major organized creditor groups expressing support for mediation and a coterminous extension of the P.I.). Confoundingly, Maryland did not object to the Debtors' extension motion, but instead filed a Motion to Dismiss the P.I. adversary proceeding on July 5, 2024. Maryland did not—and still has not—noticed its motion for a hearing, and indicated in a footnote that it would voluntarily abide by the terms of the P.I. for the initial mediation period. *See* A0409.

*i.      The Thirty-Sixth Amended Order*

On July 9, 2024, Judge Lane granted the motion for an extension of the P.I. coterminous with an extension of mediation, holding that "[w]hile the Supreme Court's recent decision

13

precludes consummation of a plan of reorganization that contains non-consensual third-party

releases, it does not preclude a successful reorganization in these cases."  A0443.

    As a threshold matter, Judge Lane concluded that he had "related to" jurisdiction

pursuant to 28 U.S.C. § 1334(b) over the claims subject to the P.I.  The "touchstone for

bankruptcy jurisdiction," he held, is whether the action "would have any conceivable effect on

the bankruptcy estate."  A0442 (citing *In re Quigley Corp. Inc.*, 11 676 F.3d 45, 57 (2d Cir.

2012)).  The court noted that subject-matter jurisdiction exists over third-party claims that have

"strong interconnections" with the bankruptcy, such as where a non-debtor could conceivably

(even if improbably) seek indemnification or contribution.  *Id.* (citing *SPV Osus Ltd. v. UBS AG*,

882 F.3d 333, 340 (2d Cir. 2018)).  And courts have found jurisdiction over non-debtor claims

where the litigation would "entail[] proving facts that would establish the debtor's own liability."

*Id*.  Applying those standards, the Bankruptcy Court determined that "[t]his matter clearly

satisfies the test for jurisdiction," because "it's pretty clear . . . that the litigation that is the

subject of this request has a profound impact on the bankruptcy estate." A0443.  The

unassailable factual finding, long-final, was far more than "any conceivable effect"—it was

instead a "profound impact."  *Id.*

    Judge Lane also found statutory authority to enter the P.I., and that such authority was

unaffected by *Harrington*.  Because the nonconsensual third-party releases precluded by the

Supreme Court are "legally distinct" from temporary injunctions of third-party claims, the well-

established authority of the Bankruptcy Court to extend the P.I. under Section 105(a) remained

unaffected.  A0444.

    Next, the court turned to the four factors.  First, it held that "the history of these Chapter

11 cases provides strong evidence of the debtor's prospects for success . . . while lengthy, the

14

debtors and stakeholders successfully struck in mediation a series of complex and related settlements among themselves and with the Sackler families." A0443. The court also found that absent the P.I. "continued pursuit of litigation against the debtors and related parties would irreparably harm the Debtor's chances of reorganization." *Id*. This finding was based on the extensive evidentiary record: "[t]hese facts that support that conclusion remain applicable today even if the contents of any plan would be different. And that's because the value-destructive litigation dynamic that prevailed prepetition [would] certainly resume." *Id*. Such finding was validated, the court found, by "the comments by various parties today" indicating that "hundreds if not thousands of independent lawsuits [would] begin again." *Id*. Moreover, the court held that a resumption of litigation would "impose a tremendous burden on the estates" that would distract from mediation and "threaten the estate's most valuable asset; that is the estate's claims against the Sacklers." *Id*. For those reasons, and against the backdrop of unanimous support from all organized creditor groups, the court held that the balance of the equities and public interest also weighed in favor of the requested extension. *Id*. Consistent with these findings, on July 10, the Bankruptcy Court entered orders authorizing a 60-day expedited mediation and a coterminous extension of the P.I. A0456.

### ii.    The Thirty-Seventh Amended Order

Since July 10, the Mediators, the Debtors, and their key creditor constituencies have worked tirelessly, and made very substantial progress, in mediation toward achieving a broadly-supported, value-maximizing resolution of these cases consistent with *Harrington*. In light of the complexity of these cases and the dozens of key parties, however, the parties needed additional time beyond the initial 60-day extension of the P.I. SA6578 (finding that "while the amount of time here that's needed is not a short amount of time, it's hard to conclude that it's [an] unreasonable amount of time"). In total, the Debtors, at the behest of the Mediators and

with the support or non-objection of the overwhelming majority of key stakeholders, have sought three additional short, calibrated extensions for 18, 35, and 31 days, respectively.

On August 23, 2024, at the request of the Mediators, the Debtors moved for an 18-day extension of the mediation and the P.I (the "**Thirty-Seventh Extension Motion**").  A0757.  All major creditor constituencies formally supported the Debtors' request.  *See* A0772.  Both the UCC—a statutory fiduciary for all creditors—and the AHC filed statements supporting the relief requested, including the "tireless[]" efforts of the mediation parties and the "progress [made] towards developing a revised plan of reorganization and comprehensive settlement that is consistent with the recent ruling of the Supreme Court of the United States."  SA3545, SA3547.

A tiny handful of parties objected to the Thirty-Seventh Extension Motion, including Maryland.  *See* A0782.  Maryland submitted a four-page limited objection to extension of the P.I. (but not to extension of mediation) in which it primarily argued that the "*ratio descendi*" of the Supreme Court's decision precludes Section 105(a) injunctions because "the law is not different for preliminary injunctive relief" than it is for the permanent discharges addressed by the Supreme Court.  A0783.  Maryland did not argue that the Bankruptcy Court lacked jurisdiction to enter the P.I., or that the four preliminary injunction factors were not met.  A0783-0784.

The Bankruptcy Court overruled Maryland on September 5, 2024, opining that "the Supreme Court addressed the question of a nonconsensual third-party release of claims.  That is a substantive resolution of somebody's claims dealing with a non-debtor.  And that's different than and legally distinct from a request to impose [an] injunction to allow a reorganization to reach an appropriate decision."  A0814. Thus, "[n]othing about the Supreme Court's decision takes away, erodes, or even addresses" the question of the authority to enter a preliminary injunction.  *Id*.

Moreover, Judge Lane opined that this was "consistent with other decisions that have come out" following *Harrington*.  *Id.*

Judge Lane also found that the Debtors amply satisfied all four of the preliminary injunction factors.

*First*, the Bankruptcy Court held that "[t]he history of these Chapter 11 cases . . . provide strong evidence of the Debtors' prospects for success coming out of mediation."  A0813.  The Debtors and their stakeholders have a long track record of striking "in mediation a series of complex and related settlements."  *Id.*  The court emphasized that the Mediators—who "have their pulse on the mediation and are really in the best position" to assess the progress made—requested that the Debtors move for the extension.  *Id.*  Moreover, Judge Lane found the support of the UCC "highly relevant and probative and persuasive to the Court" given that it "represents all Unsecured Creditors in this case and their interests."  *Id.*  Finally, Judge Lane determined that the "[t]he movants and the supporting parties correctly recognize that the breathing room provided by the requested injunction is critical to the parties' mediation efforts with the Sacklers."  *Id.*

*Second*, Judge Lane determined "based on the extensive evidentiary record and argument at prior hearings" that the Debtors would be irreparably harmed absent an extension of the P.I. to facilitate mediation.  *Id.*  "Without an injunction, it's very clear that the value destructive litigation dynamic that prevailed prepetition would most certainly resume, and no one's really taken a contrary view."  *Id.*  Not only would such an outcome "impose a tremendous burden on the estates," but it would also "distract and hamper efforts at a mediated resolution."  *Id.*  Additionally, lifting the P.I. would endanger "the estate's most valuable asset"—its claims against the Sacklers.  *Id.*

*Third*, the court held that the balance of the equities and the public interest weighed in favor of extending the injunction, *id.*, noting that all major creditor constituencies—including the UCC and a "[l]arge [c]oalition of States, Territories, and Municipalities" provide "[e]vidence of [the] widespread view that mediation is the best path forward at this time." *Id.*

### iii.    The Thirty-Eighth Amended Order

Eighteen days proved insufficient for the many parties to reach a new settlement. As requested by the Mediators, on September 13, 2024 the Debtors moved for a 35-day extension of mediation and the P.I. to "limit the need for a premature return to Court and enable the parties to continue making progress in the Mediation with a single-minded focus" (the "**Thirty-Eighth Extension Motion**"). A1140. The Mediators authorized the Debtors to report that "substantial progress" had been made in mediation, and that the Mediators believed mediation protected by the P.I. should continue. A1145.

The Thirty-Eighth Extension Motion again had broad creditor support, including from the MSGE, the UCC, and the AHC. A1144. The UCC and MSGE both advised that continued mediation with the commensurate protection of the P.I. was "in the best interests of the creditors," (SA3571), and "warranted to enable the Mediation Parties to continue negotiations." SA3565.

Maryland again submitted a four-page "Renewed Limited Objection" reiterating its position that "the Supreme Court's holding in the confirmation appeal in this case applies with equal force to bar the extension of the automatic stay to non-debtors." A1149. Maryland argued that the "balance of the harms and the public interest favor ending" the P.I. A1150. Inappropriately seeking to jump the queue, Maryland additionally argued that "[a]t the very least, investigations and litigation by sovereign states" should be excepted from the P.I. A1151.

At the September 23, 2024 hearing, the Bankruptcy Court again rejected these arguments. *See* A1173.  It reiterated that it had jurisdiction and authority to enter the P.I. as articulated at prior hearings.  A1194.

The Bankruptcy Court revisited the extensive record before it on the harms that would ensue absent the P.I., reiterating that prior to the chapter 11 filing, there were 2,600 pending lawsuits against the Debtors, many also naming the Sacklers.  A1193.  It noted that the allegations against the Sacklers were generally predicated on the same allegations as those levied against the Debtors, *id.*, and that the Debtors were projected to spend hundreds of millions of dollars on legal fees and expenses, and the "time and energy required to monitor, manage, and direct the Debtor's response to litigation [] would detract from the business and the bankruptcy case." *Id.*  And even litigation nominally against only the Sacklers would inevitably result in the Debtors being the "target of discovery . . . because the claims against the related parties such as the Sacklers [are] inextricably intertwined with those against the debtors." *Id*.

Next, the Bankruptcy Court turned to the four preliminary injunction factors.  On the likelihood of successful reorganization, the court looked to "the prospect of a successful reorganization that might come out of a mediation and whether the debtors are substantially more likely to reorganize with the injunction in place."  A1194.  It held that this factor was met for three reasons: first, the Debtors' strong track record of "successfully mediat[ing] complex and related settlements," A1195; second, the broad support for the requested relief, including from key creditor constituencies, including the UCC, *id*.; and third, the court credited the Mediators' representation that "substantial" progress had been made— "[a]nd of course mediators would in fact be in the best position to know what will assist in the mediation and they have asked the Debtors to make the [P.I. extension] request," *id.*  Based on the request from the Mediators, their

representations regarding the progress made, and the parties' statements in their pleadings, the court "reject[ed] the notion that the record is inappropriately stale" and held that it had an "ample record given everything before me."  A1196.

The court likewise held that the record amply demonstrated that the Estates would suffer irreparable harm were the P.I. not briefly extended.  Not only would the "value-destructive litigation dynamic that prevailed prepetition [] almost certainly resume," it would also seriously compromise the mediation.  A1195.  Moreover, allowing all creditors to litigate would endanger the estates' "claims against the Sacklers, claims that have extensive overlap with claims of non-debtor third-parties who also have claims against the Sacklers."  *Id.*  Because of that overlap, "the Sacklers would no doubt raise the same defenses and issues to creditors' claims as they would raise against the estate claims . . . [a]nd thus a legal [or] factual ruling in favor of the Sacklers in another case on any variety of issues could materially diminish the value of the estate's claims."  A1196 (citing a chart demonstrating the substantial overlap between the allegations asserted by Rhode Island against the Sacklers and against Purdue).  To guard against that risk, "the estates here would no doubt need to launch their own parallel litigation of the estate's claims and with all the attend[ant] costs and . . . difficulty that that would raise for [] mediation."  *Id.*  Ultimately, Judge Lane held that "there's really been nothing on the record to suggest . . . that that kind of full-blown litigation [would not] cause significant harm to the estate and impair the mediation effort."  A1195.  Allowing litigation against the Sacklers would "burden the estates, drain the value that should be reserved for opioid abatement and victim compensation to fund ballooning litigation costs."  A1196.

### iv.    *The Thirty-Ninth Amended Order*

On October 21, 2024, at the Mediators' request, the Debtors sought a second 35-day extension of the mediation and P.I., subsequently reduced 31 days at the hearing.  *See* SA6495;

SA4458.  The request was calibrated to "strike[] a necessary balance . . . between ensuring that the parties have time to remain solely focused on the Mediation while also ensuring that the Preliminary Injunction can be revisited in relatively short order should the Mediation fail to continue to progress."  SA4233.  The Mediators again authorized the Debtors to report that further "material progress" had been achieved since entry of the Thirty-Eighth Extension.  SA4229.  On the record at the October 31 hearing, the Debtors revised their request and reduced the extension request by four days.  SA6495.

Appellant filed a brief objection, while noting that it "has participated in the mediation and supports the mediation."  SA4398.  Appellant raised only two arguments: first, that the Debtors were both judicially and equitably estopped from seeking any further extension of the P.I. because they "deliberately delayed appellate review of the Court's previous two extensions" by seeking a short extension of the briefing schedule in the instant Appeal before this Court, SA4399; and second, that the Debtors provided "zero evidence" to support their requested relief, SA4401.

By the October 31 hearing, the Thirty-Ninth Extension Motion had broad creditor support, including from the MSGE, the UCC, the AHC, and the AG Negotiating Committee, which represents 15 states.  SA4391; *see also* SA6531 (counsel for the AHC stating that it "believe[s] that starting a litigation now is a terrible idea.  So we are not opposing the extension").  While the UCC and AG Negotiating Committee initially filed statements identifying that they had not yet determined their positions (*see* SA4414; SA4446), counsel for both groups stated at the hearing that they now fully supported the extension.  *See* SA6524 (counsel for the UCC stating it "endorse[s] the request for extension through December 2"); *id.* at 43:15-24 (counsel for the NYAG, on behalf of the AG Negotiating Committee, stating that

"there is substantial cause for optimism that the mediation can and will produce a broadly-acceptable consensual resolution" and "we fully support without reservation or wobbling the Debtor's request for this limited injunction").

In addition, Co-Mediator Judge Shelley Chapman (Ret.) appeared at the October 31 hearing to provide an interim Mediators' report. She advised that the Mediators "fully support the extension requested by the Debtors." SA6504. Judge Chapman "confidently report[ed] to the Court that the mediation to date has made significant and important progress," and "[m]any . . . critical threshold issues have been resolved." *Id.* at 21:22-25.

At the outset, the Bankruptcy Court "incorporate[d] by reference its prior rulings" on, among other things, the issue of whether *Harrington* "prohibited the issuance of the kind [of] preliminary injunction requested" by the Debtors. SA6572. The court also incorporated by reference its prior holdings on (i) "whether the Debtors had demonstrated a reasonable prospect for reorganization in these bankruptcy cases," (ii) "whether the estates would be irreparably harmed without the injunction," and (iii) "the balance of harm that weighed in favor of the requested injunction." *Id.*; *see also id.* at 27:4-18 (finding that "some of the facts have not changed" and while the "continually-evolving factor of time" may implicate the Debtors' reasonable likelihood of success, "given the comments of . . . Judge Chapman . . . that factor pretty much ends up turning out to be much the same as it has in prior hearings").

Ultimately, Judge Lane found that "significant and important progress has been made on many critical issues in the mediation" and that the Mediators believe the "open issues are resolvable." *Id.* at 91:19-92:5. Indeed, Judge Lane emphasized that one of Maryland's sister states went "so far as to strike optimism that a negotiated resolution is in sight." *Id.* By contrast, the onset of litigation (of potentially hundreds of actions) absent the P.I. would "undermine that

22

most crucial but elusive of all things in mediation, momentum towards progress." *Id.* at 25:12-

21. Judge Lane credited the Mediators' representations, as well as the representations of critical

stakeholders in the mediation, and found that the P.I. is "crucial" to allowing all parties to

"dedicate[e] their full and undisturbed attention to mediation efforts." Id. at 92:7-17. Moreover,

Judge Lane held that "[a]ny litigation will be full-blown, all-out litigation with all parties looking

out [for] their own interests." *Id.* Such outcome would "sap the mediation of its momentum."

*Id.*

      In rejecting the objections, the Bankruptcy Court stated that Appellant's estoppel

argument "has no place in this debate about the merits of this extension" or the question of

"whether this extension is appropriate." *Id.* at 40:8-10. The Bankruptcy Court otherwise found

that Appellant's estoppel argument was "problematic on many levels" and urged Appellant "to

exercise [its] prosecutorial discretion on what arguments [it] decide[s] to pursue" before this

Court. *Id.* at 64:10-25.

      The Thirty-Ninth Extension was entered on November 1, 2024. SA3605.

### STANDARD OF REVIEW ON APPEAL

      A bankruptcy court's decision to grant, deny, or modify a preliminary injunction is

reviewed for abuse of discretion. *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 206 (2d Cir.

2014). A bankruptcy court abuses its discretion only where "its decision rests on an error of law

or a clearly erroneous factual finding, or when its decision cannot be located within the range of

permissible decisions." *Id*. (quoting *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 278 (2d Cir. 2012)). A

finding of fact is clearly erroneous only if this Court is "left with the definite and firm conviction

that a mistake has been committed." *Adler v. Lehman Bros. Holdings Inc. (In re Lehman Bros.*

*Holdings Inc.)*, 855 F.3d 459, 469 (2d Cir. 2017) (quoting *Anderson v. City of Bessemer*, 470

U.S. 564, 573 (1985)).  A bankruptcy court's legal conclusions are reviewed *de novo*.  *See Elliot v. Gen. Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 158 (2d Cir. 2016).

**ARGUMENT**

**I.    THE BANKRUPTCY COURT HAD SUBJECT MATTER JURISDICTION**

It is well-settled that the subject matter jurisdiction of bankruptcy courts under 28 U.S.C. § 1334(b) extends to any claim that "could conceivably have any effect on the estate being administered in bankruptcy."  *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1995).  The claims Maryland has asserted against the Debtors' Related Parties fit well within this jurisdiction, <u>as this Court and the Second Circuit have already concluded</u>, *see Dunaway*, 619 B.R. at 49-55; *In re Purdue Pharms. L.P.*, 69 F.4th 45, 71-72 (2d Cir. 2023); Maryland is incorrect that *Harrington* in any way altered—much less *sub silentio* overturned—decades of precedent on bankruptcy court jurisdiction.

*Celotex* specifically addressed "related to" jurisdiction in the context of a Section 105(a) injunction staying a proceeding against a non-debtor.  *Celotex*, 514 U.S. at 307.  Respondents— judgment creditors seeking to execute on a supersedeas bond against an insurer—advanced Maryland's exact argument:  that the bankruptcy court lacked jurisdiction to issue the injunction because it was not "related to" Celotex's bankruptcy.  *Id.*  The Court rejected that argument, holding that Congress intended "related to" jurisdiction under § 1334(b) to be a "grant of some breadth," encompassing "more than simple proceedings involving the property of the debtor or the estate."  *Id.* at 308.  Although allowing execution on the bond would "not directly involve Celotex," the Court nevertheless found that it could impact the Debtor's settlement prospects with its insurers.  *Id.* at 309.

Applying this capacious standard, this and all Circuits have routinely held that Section 105(a) injunctions can be used to temporarily enjoin claims against non-debtor third-parties if the action could have "any conceivable effect on the bankruptcy estate." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 340 (2d Cir. 2018) (quoting *Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011)).  Accordingly, where a third party action is interconnected with the bankruptcy, courts exercise jurisdiction to protect the estate's assets. *See In re WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 321 (S.D.N.Y. 2003) ("The existence of strong interconnections between the third party action and the bankruptcy has been cited frequently by courts in concluding that the third party litigation is related to the bankruptcy proceeding.").  Most recently, in *SPV Osus*, the Second Circuit found the stay of an action against a third-party nondebtor was clearly within the court's "related to" jurisdiction since any finding of liability against the third party could result in joint and several liability and a potential claim for contribution, which would impact the *res* to the detriment of the debtor's creditors.  882 F.3d at 342.

The Bankruptcy Court correctly determined that Maryland's claims would have far more than a "conceivable effect" on the Debtors' estates.  Maryland's prosecution of its enjoined claims would directly "threaten the estate's most valuable asset; that is the estate's claims against the Sacklers," and would necessarily require the Debtors to expend resources to protect their interests in the prosecution of those claims.  A0443; *see* A1196.  As the Bankruptcy Court held just last week, "the estate claims here are not separate and unrelated to the direct claims.  There are overlapping factual questions and at the very least . . . there's potential concerns about collateral estoppel and res judicata."  SA6576-77.  That overlap is apparent from just a glance at Maryland's complaint.  Every Sackler named in Maryland's Complaint is also named in the

UCC's draft Complaint asserting the Estates' claims, and, as illustrated *infra* at 37-38, Maryland's allegations against the Sacklers substantially overlap with the Estates' claims against them.  Any ruling on Maryland's claims at any stage in the litigation threatens the ongoing mediation and could impact the Estates' most valuable asset.

Moreover, and as explained *infra* at 38-39, Maryland's claims against the Sacklers could 'conceivably' lead to contribution or indemnification claims asserted against the Estates (or litigation thereof) and implicate shared insurance coverage.  The Debtors' governing documents provide for indemnification to the fullest extent of the law for current and former directors and officers of Purdue and its subsidiaries—which potentially covers every Sackler sued by Maryland.  *See* SA1759.  The mere possibility of an indemnification or contribution obligation is sufficient for "related to" jurisdiction.  *See, e.g.*, *SPV Osus*, 882 F.3d at 340 (possible contribution claim against Debtors sufficient for "related to" jurisdiction).  Appellant's assertion that the indemnification claims cannot support subject matter jurisdiction improperly reasserts arguments this Court definitively rejected nearly three years ago, *see Dunaway*, 619 B.R. at 51-53, and that the Second Circuit likewise rejected in affirming this Court's jurisdictional rulings, *In re Purdue Pharms. L.P.*, 69 F.4th at 72.[7]

The Bankruptcy Court also correctly held that *Harrington* neither addressed nor altered bankruptcy courts' subject matter jurisdiction.  *Harrington* was expressly "confin[ed] . . . to the question presented," which was whether Section 1123(b) authorizes a nonconsensual "permanent[] . . . discharge" for non-debtors.  *Harrington*, 144 S. Ct. at 2081, 2088.  That

---

[7] These holdings are binding law of the case.  *See Arizona v. California*, 460 U.S. 605, 618 (1983) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."); *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991).

question is irrelevant to the scope of bankruptcy courts' jurisdiction, and lower courts cannot presume that the Supreme Court *sub silentio* overturned its own precedent.  *See generally Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) (holding that the Supreme Court "does not normally overturn, or so dramatically limit, earlier authority *sub silentio*"); *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 149 (2d Cir. 2012) ("There is a presumption that the Supreme Court does not overrule itself *sub silentio*.").

Finally, Maryland's assertion that the Bankruptcy Court lacked jurisdiction to issue the injunction and could at most "render . . . only proposed findings of fact and conclusions of law concerning the Related Party-aspects of the preliminary injunction" (App. Br. 1.) is directly contrary to *Dunaway* and confuses subject matter jurisdiction with the Bankruptcy Court's authority to enter a final order extending the P.I.  In *Dunaway*, this Court held that creditors' direct claims against the Sacklers are non-core proceedings and do not "arise in" the bankruptcy, such that the Bankruptcy Court could enter a final order adjudicating such claims on the merits, *Dunaway*, 619 B.R. at 55-6.  The Second Circuit likewise agreed that the Bankruptcy Court lacked the authority to enter a final order adjudicating such claims on the merits.  *In re Purdue Pharma L.P.*, 69 F.4th at 68.  Appellant's argument is misplaced, however, because the Bankruptcy Court did not here attempt to adjudicate any of Maryland's claims on the merits; to the contrary, the Bankruptcy Court has repeatedly explained that the P.I. does not address the merits.  The temporary injunction—as opposed to the claims enjoined—arises in the bankruptcy case and falls squarely within the Bankruptcy Court's constitutional authority.

## II.    THE PRELIMINARY INJUNCTION IS COMFORTABLY WITHIN THIS COURT'S STATUTORY AUTHORITY

### A.    Section 105(a) Empowers Bankruptcy Courts to Enjoin Third-Party Litigation That Impedes Reorganization

The Court's statutory authority to temporarily enjoin creditors from prosecuting suits against non-debtors that impede reorganization is well established.  Longstanding and binding precedent holds that, upon satisfying the four traditional preliminary injunction factors, bankruptcy courts can temporarily enjoin creditor suits against non-debtors pursuant to Section 105(a).

Section 105(a) of the Bankruptcy Code empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code, and provides them with broad equitable powers to ensure orderly bankruptcy proceedings.  11 U.S.C. § 105(a).  For decades, the Second Circuit has held that "the Bankruptcy Court has authority under section 105 broader than the automatic stay provisions of section 362 and may use its equitable powers to assure the orderly conduct of the reorganization proceedings."  *In re Baldwin-United Corp. Litig.*, 765 F.2d 343, 348 (2d Cir. 1985); *see also, e.g.*, *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 93 (2d Cir. 1988) (section 105(a) provides "[a]dditional authority" to enjoin lawsuits "that might impede the reorganization process"); *In re Bernard L. Madoff Inv. Secs., LLC*, 512 F. App'x 18, 20 (2d Cir. 2013) ("Section 105(a) is to be 'construed liberally to enjoin suits that might impede the reorganization process.'") (quoting *MacArthur*, 837 F.2d at 93).[8]

_____

[8] Decisions in at least the Third, Fourth, Sixth, Seventh, Eighth, and Ninth Circuits are in accord.  *See, e.g.*, *In re Caesars Ent. Operating Co., Inc.*, 808 F.3d 1186, 1188 (7th Cir. 2015) (Section 105(a) permits bankruptcy courts to issue injunction if it is "likely to enhance the prospects for a successful resolution of the disputes attending its bankruptcy"); *In re Canter*, 299 F.3d 1150, 1155 (9th Cir. 2002) ( "Section 105(a) contemplates injunctive relief in precisely
(….continued)

There is nothing novel about federal courts using injunctive powers to protect their jurisdiction. The Supreme Court long ago recognized that the authority to enjoin third-party litigation to protect bankruptcy jurisdiction predates the Bankruptcy Code; it flows from the predecessor Bankruptcy Act, the traditional authority of courts of equity, and is rooted in the All Writs Act. *See Continental Illinois Nat. Bank & Trust Co. v. Chicago, Rock Island & Pacific Railway Co.*, 294 U.S. 648, 675-77 (1935) (holding that "[t]he power to issue an injunction when necessary to prevent the defeat or impairment of its jurisdiction is [] inherent in a court of bankruptcy, as it is in a duly established court of equity" and is also sourced in the All Writs Act and the predecessor to Section 105(a) of the Bankruptcy Code); *see also In re Bush Terminal Co.*, 78 F.2d 662, 665 (2d Cir. 1935) (citing *Continental Illinois* and Section 105(a)'s predecessor, Section 2(15), recognizing that "[a] court of equity or bankruptcy may enjoin any action which would tend to defeat or impair it jurisdiction"); *In re Chanticleer Assocs., Ltd.*, 592 F.2d 70, 74 (2d Cir. 1979) (citing Section 2(15) for the principle that "the court's power to preserve its jurisdiction by enjoining proceedings that would remove property from the bankrupt estate is fundamental to the scheme of the Bankruptcy Act.").[9]

---

those instances where parties are pursuing actions pending in other courts that threaten the integrity of a bankrupt's estate" (internal quotation marks and citation omitted)); *Chao v. Hosp. Staffing Servs., Inc.*, 270 F.3d 374, 384 n.5 (6th Cir. 2001) ("The bankruptcy court has ample other powers to stay" an action when automatic stay does not apply, "including the discretionary power under [section] 105(a)" (internal quotation marks and citation omitted)); *Carlton v. Firstcorp, Inc.*, 967 F.2d 942, 944 n.4 (4th Cir. 1992) (Section 105 "includes the power to enjoin the continuation of ongoing judicial and administrative proceedings which are excepted from the automatic stay"); *Browning v. Navarro*, 743 F.2d 1069, 1084 (5th Cir. 1984) (finding same); *Penn Terra Ltd. v. Dep't of Env't Res., Com. of Pa.*, 733 F.2d 267, 273 (3d Cir. 1984) (holding same); *State of Mo. v. U.S. Bankr. Ct. for E. D. of Ark.*, 647 F.2d 768, 777 (8th Cir. 1981) ("[T]he bankruptcy court possesses power [under Section 105] in its discretion to enjoin state courts, officials, and agencies[.]").

[9] The All Writs Act, dating to the Judiciary Act of 1789, authorizes federal courts to issue injunctions necessary to carry out their statutory jurisdiction. 11 U.S.C. § 1651(a) ("[A]ll courts (....continued)

This is also consistent with the legislative history of Section 105, which makes crystal-clear that Congress intended Section 105(a) to be used to enjoin suits <u>not subject to the automatic stay</u> when necessary to ensure an orderly reorganization:

> The court has ample . . . powers to stay actions not covered by the automatic stay. Section 105 . . . grants the power to issue orders necessary or appropriate to carry out the provisions of title 11.  The district court and the bankruptcy court as its adjunct have all the traditional injunctive powers of a court of equity . . . .  Stays or injunctions issued under these other sections will not be automatic upon commencement of the case, but will be granted or issued under the usual rules for the issuance of injunctions . . . .

> By excepting an act or action from the automatic stay, the bill simply requires that the trustee move the court into action, rather than requiring the stayed party to request relief from the stay. There are some actions, enumerated in the exceptions, that generally should not be stayed automatically upon commencement of the case, for reasons of either policy or practicality. Thus, the court will have to determine whether a particular action which may be harming the estate should be stayed.

S. Rep. No. 989, 95th Cong., 2d Sess. at 51 (1978), reprinted in App. Pt. 4(e)(i) *infra*; H. R. Rep. No. 595, 95th Cong., 1st Sess. 341-42 (1977), reprinted in App. Pt. 4(d)(i) *infra*.[10]

---

established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions."); Judiciary Act of 1789 Section 14, 1 Stat. 81-82 ("[A]ll the before-mentioned courts of the United States shall have power to issue writs . . . which may be necessary for the exercise of their respective jurisdictions.").  Congress built upon this authority in Section 2(15) of the Bankruptcy Act, which authorized the issuance of "such orders . . . as may be necessary for the enforcement of the provisions of this Act."  55 Stat. 546 (1898).

[10] Courts have also recognized a bankruptcy court's authority under the Anti-Injunction Act, in conjunction with the All Writs Act, as a basis to issue injunctive relief to protect its jurisdiction.  *See, e.g.*, 28 U.S.C. § 2283 ("A court of the United States may not grant an injunction to stay proceedings in a State Court *except as expressly authorized by Congress*, or *where necessary in aid of its jurisdiction*" (emphasis added)); *In re Joint E. & S. Dists. Asbestos Litig.*, 120 B.R. 648, 656 (E.D.N.Y. 1990) ("Whether viewed as an affirmative grant of power . . . or an exception to the Anti-Injunction Act, the All-Writs Act permits courts to . . . stay pending federal and state cases brought on behalf of class members."); *In re Fundamental Long Term Care, Inc.*, 527 B.R. 497, 513 (Bankr. M.D. Fla. 2015) ("If an injunction falls within one of the three exceptions set forth in the Anti-Injunction Act, then it is authorized under the All Writs Act[].").

Section 105(a)'s legislative history further shows that Congress vested bankruptcy courts with all powers granted in the All Writs Act as well as "powers traditionally exercised by the bankruptcy court that are not encompassed by the All Writs Statute."  H.R. 595, 95th Cong., 1st Sess. 316-17 (1977), reprinted in App. Pt. 4(d)(i) *infra* (emphasis added); s*ee, e.g.*, *In re Mastro*, 585 B.R. 587, 596 (B.A.P. 9th Cir. 2018) ("We long ago held that [Section] 105(a) encompassed the powers of the All Writs Act in bankruptcy proceedings" and "[i]ndeed, both [Section] 105(a) and the All Writs Act serve similar purposes"); *In re G-I Holdings, Inc.*, 327 B.R. 730, 739 (Bankr. D.N.J. 2005) ("Section 105(a) is the 'All Writs' provision of the Bankruptcy Code."); *In re Ajasa*, 627 B.R. 6, 24 (Bankr. E.D.N.Y. 2021) ("[T]he authority granted to bankruptcy courts by Section 105 is – by design – broader than the authority granted to federal courts in the All Writs Act."); *In re Golden*, 630 B.R. 896, 920 (Bankr. E.D.N.Y. 2021) (finding Section 105(a) is "explicitly and by design [ ] broader than . . . the All Writs Act") (discussing *In re Haynes*, 2014 WL 3608891 (Bankr. S.D.N.Y. July 22, 2014)).

Relying exclusively on a footnote in *Harrington*, Maryland infers that Section 105(a) alone cannot authorize preliminary injunctive relief because Section 105(a), by itself, cannot authorize a nonconsensual third-party release.  That inference is entirely unsupported by the language of Section 105(a) or case law interpreting it which, as the foregoing paragraph demonstrates, reflects Congress's decision to vest bankruptcy courts with all traditional authority under the All Writs Act in addition to equitable authority to take actions in furtherance of another provision of the Bankruptcy Code.  The P.I. falls squarely within the former category of Section 105(a) authority because the actions subject to the P.I. would obstruct a successful reorganization and interfere with the Bankruptcy Court's jurisdiction over the Estates' claims against the Sacklers.

Maryland also fails to meaningfully engage with the plain language of the statute and controlling and persuasive authority supporting the issuance of 105(a) injunctions against third-party litigation to facilitate a debtor's orderly reorganization. Undeterred by the Bankruptcy Court's repeated rulings to the contrary, Maryland continues to argue that *Harrington* bars temporary injunctions of actions against non-debtors. *Compare* App. Br. 10, *with* A0444 ("What the Supreme Court addressed is a non-consensual third-party release of claims. That is different than and legally distinct from a request to impose an injunction to allow a reorganization time to reach an appropriate resolution."); A0814 (same); A1194 (same); SA6572 (incorporating prior rulings on this issue).

Every court to address the issue in the wake of the Supreme Court's ruling has concluded that *Harrington* does not implicate, let alone eliminate, a bankruptcy court's statutory authority to issue Section 105(a) temporary injunctions. *See, e.g.*, *In re Coast to Coast Leasing, LLC*, 661 B.R. 621, 624 (Bankr. N.D. Ill. 2024) (*Harrington* does not preclude Section 105(a) injunctions of creditor claims against non-debtor third parties); *In re Parlement Techs., Inc.*, 661 B.R. 722 (Bankr. D. Del. 2024) ("*Purdue Pharma* does not preclude the entry of [ ] a preliminary injunction" against non-debtor third parties); *In re Onyx Site Servs., LLC*, 2024 WL 4132150, at *2 (Bankr. M.D. Fla. Aug. 22, 2024) (granting Section 105(a) injunction of claims against non-debtor principal of the debtor); *In re Diocese of Buffalo, N.Y.*, 663 B.R. 197, 200 (Bankr. W.D.N.Y. 2024) ("Nothing in [*Harrington*] decision expressly prohibits a temporary stay of litigation against [non-debtor] parishes and affiliates.").

## B. The Preliminary Injunction Is Consistent With Traditional Principles Of Equity Jurisprudence

Appellant's argument that "basic principles of equity jurisprudence" prevent the Bankruptcy Court from "grant[ing] preliminary injunctive relief that restrains conduct for which

permanent injunctive relief is not available" (App. Br. 4) misconstrues both the P.I. in this case

and the caselaw.  Appellant seems to suggest that temporarily enjoining the Related Party actions

is no longer proper now that the Supreme Court has foreclosed nonconsensual third-party

releases in reorganization plans.  Appellant's cited caselaw, however, stands for nothing more

than the proposition that injunctive relief is improper when "it deals with a matter lying wholly

outside the issues in the suit" and "which *in no circumstances* can be dealt with in any final

injunction that may be entered."  *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220

(1945) (emphasis added).[11]

Here, the goal of mediation is to negotiate a maximally consensual plan of

reorganization, one in which many creditors may agree to release their claims—the same claims

enjoined by the P.I.—against the Related Parties.  Thus, the P.I. is "of the same character as that

[relief] which may be granted finally."  *Id.* at 220; *see also Williams v. N.Y.C. Dep't of Corr.*,

2020 WL 7079497, at *2 (S.D.N.Y. Dec. 3, 2020) (injunctive relief is improper only if it "is

unrelated to the claims and the defendants in the complaint." (emphasis added)).  That creditors

cannot be forced to release their claims against the Related Parties does not suggest that the P.I.

is improper.  Moreover, a critical function of the P.I. is to protect the Estates' most valuable

---

[11] Appellant's caselaw is either wholly inapposite or involves courts purporting to issue injunctions where the relief sought was not "of the same kind" of relief that could be granted at the end of the case.  *See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999) (denying issuance of an asset freezing injunction in a money damages action where the movant claimed no lien or equitable interest in the assets sought to be enjoined); *Weston v. Bayne*, 2023 WL 8183219, at *3-*4 (N.D.N.Y. Nov. 27, 2023) (denying request to direct corrections department to schedule medical treatment for plaintiff where the only remaining defendants in the case were not involved in plaintiff's medical treatment); *Kosha, LLC v. Alford*, 2019 WL 6050725, at *2 (M.D. Ga. Nov. 7, 2019) (*granting* a request for injunctive relief where the action sought to be enjoined was "necessary to protect the court's future ability to provide appropriate permanent equitable relief"); *Barnes v. Tarrytown Urb. Renewal Agency*, 338 F. Supp. 257, 262 (S.D.N.Y. 1971) (denying request for injunction after making factual findings that the movant did not establish success on the merits or irreparable harm).

assets—their claims against the Sacklers. *See Republic of Philippines v. Marcos*, 806 F.2d 344, 356 (2d Cir. 1986) ("[P]reliminary injunctions are proper to prevent a defendant from making a judgment uncollectible."); *World Sleep Prods., Inc. v. Restonic Corp.*, 1995 WL 792078, at *3 (N.D.N.Y. Aug. 25, 1995) (suggesting injunctive relief would be appropriate if plaintiffs were "seeking to preserve a specific fund or *res* whose ownership is contested and which would be 'the subject of the provisions of any final decree in the cause'"). As the Second Circuit has held for decades, temporary injunctions of third-party claims that may interfere with a Debtors' reorganization are available to facilitate final relief in the form of a reorganization. They are not a bridge to (now unlawful) third party releases.

## III.    THE PRELIMINARY INJUNCTION FACTORS SUPPORT THE EXTENSIONS

The Bankruptcy Court's decision to extend the P.I. is supported by extensive record evidence of harm to the Debtors if the injunction is lifted, substantial progress in the mediation, and support for the injunction from key stakeholders, including "by parties who have a similar stake" to Appellant. SA6578. Without citation to any evidence, Maryland baldly asserts that the injunction is not necessary to facilitate the Debtors' reorganization. Ignoring entirely the very real, very costly, and burdensome history of litigation prior to the Bankruptcy Court's entry of the P.I.—supported by documentary evidence and testimony at a full-day hearing—Maryland asserts in conclusory fashion that any harm the Debtors would suffer is "speculative," and asserts that some unspecified "different reorganization that does not protect the Sacklers" would be possible if the injunction lifts. App. Br. 13, 16. The record proves otherwise.

### A.    The Debtors' Prospects for a Successful Reorganization Are Reasonable

As this Court has previously held, "debtors need not present proof of the uncertain in order to demonstrate a *reasonable* likelihood of a successful reorganization." *See Dunaway*, 619

B.R. at 58 (internal quotation marks and citation omitted).  Indeed, "[c]ourts do not demand certainty of a successful reorganization; they expect only reasonable prospects of such."  *See, e.g.*, *In re Soundview Elite Ltd.*, 543 B.R. 78, 119 (Bankr. S.D.N.Y 2016).

Here, the parties have made continued and material progress in mediation toward a consensual resolution of what then-Judge Drain described as "the most complex [Chapter 11 case] . . . that I have handled, and frankly that the courts under Chapter 11 have handled."  *In re Purdue Pharma L.P.*, 633 B.R. 53, 106 (Bankr. S.D.N.Y. 2021).  As Judge Chapman explained during the October 31, 2024 hearing "the issues that must be resolved are not just between the Debtors and creditors on the one hand and the Sackler parties on the other hand, but also between and among the many, many different stakeholder groups involved in this case."  SA6502.  Despite those challenges, the parties to the mediation have achieved "significant and important progress" with "[m]any but not all critical threshold issues [] resolved" and "meaningful movement by certain key parties towards a settlement."  SA6503-504.  Importantly, "[t]he parties are getting closer and closer by the day and the remaining open issues in our view are resolvable."  *Id.* at 22:4-5.

Contrary to Maryland's naked assertion that the harm to the Debtors' reorganization prospects if the injunction lifts are merely speculative, the Mediators' view (shared by the Bankruptcy Court and virtually every other party in the case) is that "termination of the injunction now would greatly jeopardize our ability to achieve a resolution that will broadly benefit all stakeholders."  *Id.*  The Mediators reported that "the protection of the preliminary injunction and the absence of material active litigation among the parties during the mediation has been critical to the progress that has been made to date."  *Id.*  On behalf of itself and [fifteen] of Maryland's sister states, The State of New York fully endorsed the Debtors' extension request

and reported that "there is substantial cause for optimism that the mediation can and will produce

a broadly-acceptable consensual resolution" that "is now within view." SA6526. New York

added that "it is not surprising, as Judge Chapman also alluded to this morning, that a case of this

complexity would take this much time and perhaps some additional days, weeks to get to our

desired destination." SA6527. Here, "the fact that discussions are continuing provides support

for the finding that continuing the injunction increases the likelihood of a successful

reorganization." *Dunaway*, 619 B.R. at 59.

 In light of the Mediators' support, and the vocal accord of numerous key case

constituencies, there can be no serious dispute that "the Debtors are substantially more likely to

reorganize with the injunction in place." *Dunaway*, 619 B.R. at 59 (internal quotation marks and

citation omitted); *see also In re SVB Fin. Grp.*, 2023 WL 2962212, at *7 (Bankr. S.D.N.Y. Apr.

14, 2023) (stating same). Recent positive developments prove that the Bankruptcy Court was

correct in holding that "the breathing room provided by the requested injunction is critical to the

parties' mediation efforts" and "not extending the injunction would then present a more difficult

job for the mediators" in facilitating the parties' negotiations. A1195, A1196 (finding that "a

return to litigation at this time could at a minimum unnecessarily complicate mediation at this

critical juncture").

### B. Irreparable Harm Would Befall the Estates if the Injunction is Lifted

 The Bankruptcy Court correctly determined that renewed prosecution of hundreds of

actions against the Debtors' Related Parties would inevitably place discovery and related burdens

on the Debtors and "would put at risk the estate's claims against the Sacklers" which are "the

estate's most valuable assets." A1196. The Estates' involvement in hundreds of suits across

jurisdictions would "drain the value that should be reserved for opioid abatement and victim

compensation to fund ballooning litigation costs." *Id.*; *see also* A1182 ("I haven't seen an argument made . . . [that] one party pursuing the Sacklers categorically can have no impact on . . . cases [the Debtors] might have against the Sacklers.").

To take just one example, a comparison of Maryland's complaint to the UCC's draft complaint, SA5852, confirms that the allegations underlying the Estates' causes of action substantially overlap with the allegations underlying the claims subject to the P.I.:

| UCC Complaint | Maryland |
|---|---|
| Redacted Amended Draft Complaint, *Purdue Pharms. L.P., et al., by and through The Official Committee of Unsecured Creditors v. Sackler*, No. 19-23649 (SHL) (Bankr. S.D.N.Y. Sept. 6, 2024) | Amended Statement of Charges, *Consumer Prot. Div. v. Sackler*, CPD Case No. 19-023-311366 (Md. Consumer Protective Div. May 29, 2019) |
| ¶ 2: Under the **Sackler's yoke, Purdue's**. . . aggressive and **deceptive marketing** of opioid products . . . set the opioid epidemic ablaze and stoked it for decades. | ¶ 65: **The Sackler Respondents** were chief architects and beneficiaries of **Purdue's false marketing and deception** and failure to report suspicious orders. |
| ¶ 3: [A]t the **Sacklers' direction**, Purdue spread the **lie that its opioids were safe, not addictive**, and appropriate for a **wide range of new patients and pain symptoms**. | ¶ 45: **Richard Sackler** also personally directed his sales reps **not to tell doctors the truth about Respondents' opioids** because the truth could hurt sales.<br><br>¶ 258: The **Sackler Respondents** oversaw the promotional claims representatives used during sales visits. The directors and CEO, reviewed reports that Purdue sales representatives were **deceptively** promoting opioids as an **appropriate treatment for minor pain, among hundreds of other examples** of unlawful marketing techniques in need of correction. |
| ¶ 3: **The Sacklers'** scheme succeeded, leading predictably to a **rapid surge in medically unnecessary opioid prescriptions** and the widespread diversion and abuse of the drug. | ¶ 44: [**Richard Sackler**] said, "the launch of OxyContin Tablets will be followed by a **blizzard of prescriptions** that will bury the competition. The prescription blizzard will be so deep, dense, and white." |
| ¶ 10: [**T**]he **Sacklers** also failed to ensure **Purdue's** compliance with its anti-diversion duties . . . including by maintaining a suspicious order monitoring ("SOM") system | ¶ 28: **Purdue** was required by state and federal law to report and halt **suspicious orders** it received for opioids. **Under the direct supervision of the Sackler** |

37

| UCC Complaint | Maryland |
|---|---|
| . . . **Purdue,** however, **failed to maintain an effective SOM system** . . . | **Respondents** . . . Purdue utterly **failed to do so.** |
| ¶ 284: In 2014, the Business Development team, led by **Kathe Sackler**, pitched "**Project Tango**"—**a plan to expand** across "the pain and addiction spectrum" **to become an "end-to-end pain provider" by treating addiction** with Suboxone. **Purdue illustrated this marketing strategy internally with a picture of a funnel guiding patients down the funnel from pain treatment to opioid addiction treatment**. | ¶ 51: In September 2014, **Kathe Sackler** dialed in to a confidential call about *Project Tango,* **which was a secret plan for Purdue to expand into the business of selling drugs to treat opioid addiction.** In their now publicly disclosed internal documents, Kathe and staff wrote down what Purdue had publicly denied for years: that addictive opioids and opioid addiction are "naturally linked." They determined that **Purdue should expand across "the pain and addiction spectrum," to become "an end-to-end pain provider."** |
| ¶ 308: The **Sacklers** understood and **intended to use the trust structure to attempt to shield those assets from the Debtors' creditors**. | ¶ 230: The **Sackler Respondents** were thus aware of potential liability for Purdue since at least 1999 due to OxyContin's addictive nature. **Around this time, the Sackler Respondents began to transfer profits from Purdue to their own private trusts and accounts in order to shield their funds from creditors**. |
| ¶ 308: **Richard Sackler** summed up the purpose of the trusts in a letter to his children in 2015, stating that **they use "Trustees *as a liability shield* - if there is a personal or business litigation and a huge judgment is leveled, you have the freedom of going bankrupt without having to draw into these trusts**. This is useful to keep as much in the trusts as you can for liability's sake." Kathe Sackler, in an October 4, 2001 email to Mortimer Sackler Sr., similarly described the trusts of which descendants of Mortimer Sackler Sr. are beneficiaries . . . as "layers and layers that would have to be penetrated" before litigation could threaten the "vast fortune" the family had built. | ¶ 230: In **2015**, for example, the **Sackler Respondents** removed $700 million from their privately held companies, two-thirds of which came from Purdue. These **transfers of ill-gotten gains were done for the purpose of protecting the money from any civil or criminal judgment** against Purdue for its participation in the opioid crisis. These transfers also left Purdue undercapitalized and potentially unable to compensate for the staggering injuries that its illegal conduct has created. |

Moreover, the Debtors would face—and have to litigate—potential indemnification and contribution claims were litigation against their former directors and officers allowed to continue. The Debtors' organizational documents provide for indemnification to the fullest

extent of the law for current and former directors and officers. *See* SA1759. Litigating the applicability of that obligation to dozens of parties will of course be expensive and would distract the Debtors from the crucial task of mediation. And any successful claim for contribution or indemnification would further drain the Estates to the detriment of creditors. *See Dunaway*, 619 B.R. at 59; *In re The 1031 Tax Grp., LLC*, 397 B.R. 670, 685 (Bankr. S.D.N.Y. 2008) (granting preliminary injunction where there was a "substantial risk that the Debtors face liability for indemnification" absent the injunction); *In re Ionosphere Clubs, Inc.*, 111 B.R. 423, 435 (Bankr. S.D.N.Y. 1990) (granting preliminary injunction where suits to be enjoined would burden the estates with discovery, inevitably involve the debtors in litigation, divert the attention of the debtors away from reorganization, and potentially trigger indemnification rights) *aff'd in part*, 124 B.R. 635 (S.D.N.Y. 1991).

Finally, and critically, as the Bankruptcy Court has found time and again, lifting the Injunction would threaten to upend the mediation. *See supra* at 17, 19, 22. If the Debtors are forced to be involved in hundreds of cases, they will be unable to devote their full attention and resources to mediation. Key stakeholders whose active participation in the mediation is critical to its success would inevitably require creditors to compete with each other rather than collaboratively work to maximize total available value. In short, absent the P.I., "the Court agrees that any litigation here means all litigation," which "will be full-blown, all-out litigation with all parties looking out [for] their own interests." SA6574; *see also* A0814. The Bankruptcy Court found that "it's clear that such an approach at this point would sap the mediation of its momentum towards a solution." SA6574.

### C.    The Balance of Harms and Public Interest Support Extension of the Injunction

The Bankruptcy Court correctly determined that the balance of equities weighs strongly in favor of extending the injunction.  Maryland's assertion that its interest in pursuing unspecified civil law enforcement actions against the Sacklers "vastly exceeds Purdue's minimal-by-comparison private interest in obtaining a fresh start" is belied by the fact that the overwhelming majority of its similarly situated sister states support or did not object to the extensions.  App. Br. 16.  The only non-monetary relief that Maryland seeks against the Sacklers is that they "cease and desist from engaging in unfair or deceptive trade practices in violation of the Consumer Protection Act."  A1721.  But the Sacklers have not been involved with the Debtors for almost six years, and the Voluntary Injunction already bars the Sacklers from "actively engag[ing] in the opioid business in the United States."  SA4489.  Maryland's desire to recover money damages from the Sacklers first, and to the detriment of so many others, does not remotely outweigh the harm to the Debtors and their hundreds of thousands of creditors (including virtually every other state) that would ensue if the P.I. is lifted and the mediation and the Estates' most valuable assets, along with the recovery potential for other creditors, are compromised and jeopardized.

There are billions of dollars at stake for the benefit of the American people.  Success in mediation will unlock desperately needed funds for opioid abatement and victim compensation, but failure would mean those funds are squandered in years of internecine creditor-against-creditor competition and litigation across the nation.  SA6574.  The victims of the opioid crisis deserve the opportunity to conclude the mediation and receive the compensation and closure that has eluded them for so many years.

## **CONCLUSION**

For the foregoing reasons, the Debtors respectfully request that this Court affirm the

Thirty-Seventh Extension, the Thirty-Eighth Extension, and Thirty-Ninth Extension.

Dated:   November 7, 2024
         New York, New York


By: */s/ Benjamin S. Kaminetzky*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Marc J. Tobak
Joshua N. Shinbrot


*Counsel to the Debtors-Appellees
and Debtors in Possession*

41

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Bankruptcy Procedure 8015(h), the undersigned certifies that the above memorandum complies with the applicable type-volume limitation of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B) because, excluding the parts of the memorandum exempted by Federal Rule of Bankruptcy Procedure 8015(g), this memorandum contains 12,807 words. The above memorandum also complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and type-style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6), as modified by the July 18, 2024 Individual Practices and Procedures— Judge Colleen McMahon § V(D), because this memorandum has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 12-point font.

*/s/ Benjamin S. Kaminetzky*
Benjamin S. Kaminetzky

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 7, 2024, I caused true and correct copies of the above memorandum to be served by the Court's Case Management/Electronic Case File (CM/ECF) System to all parties to the above-captioned appeal with CM/ECF access; to Brian T. Edmunds, counsel for Appellants, via email; and to all pro se parties to the above-captioned appeal via email and U.S. First Class Mail.

*/s/ Benjamin S. Kaminetzky*
Benjamin S. Kaminetzky